UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
UNITED STATES OF AMERICA,                         :
                                                  :   **MEMORANDUM**
                                                  :   **DECISION AND ORDER**
            - against -                           :
                                                  :   14-cr-0190 (BMC)
                                                  :   17-cv-2708 (BMC)
POPPI METAXAS,                                    :
                                                  :
                        Defendant.                :
------------------------------------------------------------ X

**COGAN**, District Judge.

Defendant's motion for habeas corpus relief under 28 U.S.C. § 2255 is based on the alleged ineffectiveness of her counsel in recommending that she accept the Government's plea offer. Defendant's essential contention is that her counsel did not understand a specific decision of the Second Circuit, United States v. Rodriquez, 140 F.3d 163 (2d Cir. 1998), abrogated by, Shaw v. United States, 137 S. Ct. 462 (2016), and that this decision would have constituted a complete defense to two of the three charges against her. Defendant also contends that her counsel never discussed the issue in Rodriquez with her so that she did not know of this defense. Her guilty plea, she submits, was therefore not knowing and voluntary.

Having conducted a hearing on the motion at which both defendant and her prior counsel testified, I reject both of her arguments. Prior defense counsel was thoroughly familiar with the law, including Rodriquez, and correctly presented and discussed the issue with defendant before she agreed to plead guilty. The motion is therefore denied.

## BACKGROUND

Defendant is the former president and chief executive officer of Gateway Bank, a bank

the primary business of which was warehouse lending, i.e., financing to retail mortgage lenders.

She also served on its Board of Directors.  The Office of Thrift Supervision ("OTS"), then an

agency of the United States Department of the Treasury and Gateway's regulator,[1] became

concerned about the volume of non-performing loans and real estate assets, which it described as

"toxic assets," on Gateway's books.  Gateway was carrying these assets at a $16 million

valuation, a lot more than OTS thought they were worth.  OTS advised Gateway's Board that

Gateway was exposed to a cease-and-desist order, which would have been, at least, bad for

business, if Gateway did not increase its capital and reduce its toxic assets by the end of March

2009.  Gateway then began looking for buyers of these non-performing assets.

In February and March 2009, defendant engineered a series of transactions designed to

make it seem like Gateway had sold its toxic assets for nearly the value at which Gateway was

carrying them.  First, Gateway made a $3.64 million loan to Ideal Mortgage Bankers, Ltd. (a/k/a

Lend America), Gateway's largest warehouse lending client.  Ideal then lent $3.64 million to

three other corporations (the "Ashley affiliates") owned by associates of Ideal's *de facto*

principle, Michael Ashley, via promissory notes providing for 6 percent interest over five years.

Simultaneously or nearly simultaneously, the Ashley affiliates entered into an agreement with

Gateway to purchase the toxic assets from Gateway for $15.3 million.  The terms of the asset

purchase agreement required the Ashley affiliates to pay to Gateway 25% of the purchase price

---

[1] In 2010, Congress abolished OTS and the agency's regulatory authorities and functions were transferred to the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Consumer Financial Protection Bureau.  See Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203 (2010).

as a down-payment on closing and the remainder over time.  Thus, the day after Gateway's loan to Ideal, the Ashley affiliates made a $3.85 million down payment (25% of the purchase price) to Gateway, slightly more than they had borrowed from Ideal and that Ideal had borrowed from Gateway.

Gateway did not transfer title to the assets at closing, holding the assets as security for the remainder of the $15.3 million purchase price.  After the closing, the Ashley affiliates paid about $468,752 to Gateway, and almost immediately thereafter, the purported asset purchase collapsed. The Ashley affiliates failed to pay anything further on the purchase price, and Ideal paid $164,542 on its loan from Gateway before it defaulted, after it was sued for abusive lending practices unrelated to Gateway.  Gateway was ultimately able to collect a further $1,809.970 via seizure of funds in Ideal accounts that it was holding.

Gateway re-sold the toxic assets and kept the proceeds of the sale, in addition to the payments previously made by the purchasing corporations and the offset Ideal accounts, for a total of $6,586,649.  At the time of the "round-trip" transaction, Gateway had received one offer to purchase the troubled assets for $5 million.

When defendant was deposed by the OTS, she testified that she did not know the source of the Ashley affiliates' down payment to Gateway.  She maintained that the transactions were made at arm's length.  Specifically, she was asked if she knew that the 25% down-payment for the toxic assets came from Ideal via Gateway.  She answered, "No, sir. … [O]ne of the things we did not do is verify source of down-payment."  That was, at best, less than a half-truth.  It was true that Gateway did not verify the source of the down-payment, but that was because defendant already knew the source of the down-payment – the loan to Ideal – and did not disclose to the Board or OTS that Gateway was effectively paying itself the down-payment.

In fact, defendant had altered Board minutes to make it appear that she had disclosed the particulars of the Ideal loan to Gateway's Board when in fact she had not. The original minutes, prepared from an audio recording of a Board meeting, made no reference to a loan to Ideal. Defendant added a paragraph to the minutes representing that the Board had discussed the loan to Ideal and was favorably disposed to it.

When the Board found out about the round-trip transactions, it suspended defendant without pay, and she resigned.

On March 31, 2014, the Government indicted defendant on three counts: (1) conspiracy to commit bank fraud against Gateway, 18 U.S.C. §§ 371, 3551; (2) bank fraud against Gateway, 18 U.S.C. §§ 1344(2), 3551; and (3) perjury in her testimony before the OTS concerning her knowledge of where the Ashley affiliates had obtained the funds for the down-payment on the toxic assets, 18 U.S.C. §§ 1621(1), 3551.

At all relevant times, defendant was represented by a team of lawyers from Cooley LLP, among them Laura Birger.  Among many other activities, defendant's lawyers moved to dismiss Count Three of the indictment on the ground that the question that OTS had asked defendant at her deposition was ambiguous, and her answer was therefore not perjurious.  Judge Bianco, to whom this case was originally assigned, denied the motion, and the case was set down for trial.

On April 30, 2015, about one month before trial was set to commence and on the last day upon which defendant could have accepted the Government's plea offer, defendant accepted the plea offer.  Under the plea agreement, she pled only to Count One, the bank fraud conspiracy.  In her plea allocution, defendant admitted agreeing with others "to make Gateway's books look more acceptable to the regulators."  She allocuted to knowing that the Ashley affiliates had received the Ideal loan proceeds and used them to make the down-payment to Gateway for the

4

toxic assets, and that she did not provide "complete information" to Gateway's Board prior to its approving the loan to Ideal and the purported purchase of the toxic assets.

The plea agreement had calculated defendant's Guidelines' range as 37-46 months. The Presentence Investigation Report, however, calculated the Guidelines as 108-135 months. The Government advocated for the former at sentencing, and Judge Bianco sentenced defendant to a below-Guidelines sentence of 18 months' custody and 3 years' supervised release.

In her habeas corpus motion, defendant contends that <u>Rodriquez</u> requires that a defendant intend to expose the bank to loss. She asserts that she never intended to expose Gateway. She further asserts that Gateway was never at a risk of a potential loss as a result of the round-trip transactions and never sustained an actual loss. Rather, the round-trip transaction was carefully structured to prevent not only actual loss but potential loss to Gateway.

This was achieved, according to defendant, first, by requiring that more than the amount of money that Gateway loaned to Ideal would be round-tripped through the Ashley affiliates as a down payment; and, second, by leaving title to the toxic assets with Gateway unless and until it was fully paid the $15 million purchase price. Because of this structure, defendant had a complete defense to the conspiracy and bank fraud charges. Cooley was therefore ineffective for advising her to plead guilty instead of either seeking dismissal of the bank fraud charge or taking that claim to trial and prevailing as a matter of law, and in not advising her of the complete defense to the charge. Had it so advised her, she asserts that she would not have pled guilty.

## DISCUSSION

### I.      Habeas Corpus Principles

"Section 2255 provides that a prisoner sentenced by a federal court may move to have

that sentence vacated, set aside or corrected if he or she claims that the court, in sentencing …

her, violated the Constitution or the laws of the United States, improperly exercised jurisdiction,

or sentenced him or her beyond the maximum time authorized by law." Thai v. United States,

391 F.3d 491, 493 (2d Cir. 2004). However, "[b]ecause collateral challenges are in tension with

society's strong interest in the finality of criminal convictions, the courts have established rules

that make it more difficult for a defendant to upset a conviction" through a proceeding under §

2255 than by direct appeal. Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010)

(citations and quotations omitted). The statute thus allows relief "only for a constitutional error,

a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a

fundamental defect which inherently results in a complete miscarriage of justice.'" United States

v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

To demonstrate ineffective assistance of counsel under Strickland v. Washington, 466

U.S. 668, 687 (1984), a defendant must show two things: (1) that his counsel's performance was

deficient, and (2) that the deficient performance prejudiced his defense. A court will deem

performance deficient if "counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed by the Sixth Amendment." Id. If there is a reasonable probability that the

outcome might have been different because of a legal error, the defendant has established

prejudice and is entitled to relief. See Weaver v. Massachusetts, 137 S. Ct. 1899, 1910-11

(2017). But an ineffective assistance of counsel claim will fail if the defendant fails to make a

sufficient showing under either of the Strickland prongs. Strickland, 466 U.S. at 697.

## II.    <u>Rodriguez</u> as a "complete defense"

Like defendant here, the defendant in <u>Rodriguez</u> was convicted of violating 18 U.S.C. §

1344.  The statute provides that:

Whoever knowingly executes, or attempts to execute, a scheme or artifice –

(1)      to defraud a financial institution; or

(2)      to obtain any of the moneys, funds, credits, securities, or other properties
owned by, or under the custody or control of, a financial institution, by means of
false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or
both.

The facts in <u>Rodriguez</u> are straightforward.  Rodriguez had a friend named Elcock who

worked at a company called Thomas Publishing.  Without authorization, Elcock drew checks on

her employer's account payable to Rodriguez.  Rodriguez cashed the checks through existing

accounts she had at Chemical Bank, sharing some of the proceeds with Elcock.  Rodriguez's

account records at Chemical Bank listed Elcock as her employer.

The Second Circuit reversed Rodriguez's conviction under 18 U.S.C. § 1344 for having

defrauded Chemical Bank.  The Court's holding had two related grounds.  First, to violate §

1344, a defendant must "engage in … a pattern or *course of conduct designed to deceive* a

federally chartered or insured financial institution into releasing property … ."  <u>Rodriguez</u>, 140

F.3d at 167 (quoting <u>United States v. Stavroulakis</u>, 952 F.2d 686, 694 (2d Cir. 1992)).  The Court

of Appeals held that the scheme was not designed to defraud Chemical Bank into releasing

property.  Nor could it have lost any funds.  It cashed the check in the ordinary course of its

business.  As a holder in due course, the Court held, Chemical Bank was not in a position to be

deceived.  It was entitled to, and presumably did, collect from the drawee bank.  Nor was there

any exception to its holder in due course status because Chemical Bank had no reason to know of the Elcock-Rodriguez fraud.  The only false statement made to the Bank was Rodriguez's misrepresentation of Elcock as her employer, but that was immaterial as it had nothing to do with facially valid checks.

For the same reason, the Court held that Rodriguez could not have been intended to expose Chemical Bank to actual or potential loss, a required element of the statute, because, as a holder in due course, Chemical Bank was never at risk.  "[W]here a bank takes a check as a holder in due course, under most circumstances the bank cannot be victimized because the bank takes that check free of any defenses or claims and is fully entitled to the proceeds thereof." Rodriguez, 140 F.3d at 168 (footnote omitted).  Although "a defendant may be convicted of federal bank fraud even where a bank is not the immediate victim of a scheme to defraud," id., Rodriguez's intent, the Court ruled, was to defraud Thomas Publishing, not to expose Chemical Bank to any potential loss.

Rodriguez has some instructive value in the instant case, but I hardly think it provides a "complete defense" to the bank fraud charges against defendant.  For one thing, the positions of Gateway and Chemical Bank have little in common.  As the Second Circuit noted, Chemical Bank, as a result of its holder in due course status, could not "be victimized because the bank takes that check free of any defenses or claims and is fully entitled to the proceeds thereof." Id. Chemical Bank was a mere conduit in Rodriguez's fraudulent scheme.  In the instant case, the whole scheme was about Gateway and, specifically, deceiving its Board of Directors.

Gateway was under close scrutiny of its regulator, OTS, and effectively directed, upon penalty of a cease-and-desist order, to sell off its $16 million of toxic assets (at least that is the value at which the assets were booked).  Defendant's response was not to do what OTS wanted –

an arms' length transaction that would sell off the toxic assets, no doubt at a substantial write-down – but to concoct a transaction that made it appear that Gateway was doing what OTS wanted with virtually no write-down, and getting additional capital in the process.  I can't imagine much worse for Gateway than a calculated plan to deceive, and thereby incur the wrath of its regulator when the same toxic assets that were the subject of the transaction were also the subject of regulatory scrutiny.  Defendant not only maintained the high-risk environment in which Gateway was operating with too many toxic assets, but defendant increased that risk by seeking to deceive Gateway's regulator.  See 12 U.S.C. § 1818(a)(2) (permitting OTS to involuntary terminate a bank's status as an insured depository institution if the insured institution has engaged in unsafe or unsound practices in conducting business); 12 C.F.R. 563.180(b)(1) (prohibiting any affiliated person from knowingly making a false or misleading statement to OTS).  The deception was not only the false conveyance of the toxic assets – it was the failure to raise even a dollar of additional capital through their sale, for the OTS was insisting on both.

The regulator was not the only one defendant sought to deceive.  By not disclosing the round-trip nature of transaction, defendant deliberately deceived Gateway's Board of Directors, and by doing that, deceived Gateway itself, as the Board no doubt would have declined to participate in the circular transaction.  That conclusion is inescapable based on defendant's failure to disclose the particulars, that is, there was no other reason to disguise the transaction from the Board except defendant's knowledge that the Board would not approve the transaction if it knew of its full details and origin.[2]

---

[2] Defendant's recent contention that she actually provided complete information to Gateway's Board is belied by the record.  At her guilty plea, she stated, under oath, the following: "I did not provide the complete information about these [round-trip] transactions to Gateway's board which ultimately had to approve them."  Judge Bianco then confirmed with defendant, "And the scheme was done with the intent to defraud Gateway Bank, you said you would disclose it to the board, this was not done.  Was that accurate, Ms. Metaxas[,]" to which defendant responded in the affirmative.  Her statements at the plea allocution carry a strong presumption of veracity, see Blackledge v. Allison,

This deception was the enabling factor in funds flowing out of Gateway to Ideal.  It is true that because the money was round-tripped a day later, Gateway was exposed for only a short time.  But Gateway was exposed, and the round-trip transaction could have collapsed sooner than it did.  Ideal was defrauding its customers, shut down less than a year later by the Government, and the Ashley affiliates, as shown by their default on the purchase price for the toxic assets once Ideal defaulted on the loan, were dependent on Ideal for the remaining funding to purchase the toxic assets.  The fact that the down payment actually was paid through the Ashley affiliates a day later does not mean that defendant engaged in a risk-free transaction.  There was no way to know what plan Ashley, or Ashley together with defendant, could have created.  Defendant's actions put Gateway at a risk of losing the $3.64 million loan to Ideal.

This ties into two of defendant's main arguments as to why <u>Rodriguez</u> exonerates her.  First, she maintains that Gateway was fully not at risk because it maintained title to the toxic assets and, as shown by the Ashely Associates' default, always had the ability to resell them upon a default.  The argument, however, is both myopic and ironic.  Defendant can hardly contend that it would be a good thing for Gateway if the transaction failed, because the entire point of the "sale" was to get the toxic assets off Gateway's books.  It would have left Gateway in full non-compliance with OTS's directive, and as discussed above, Gateway would also have had to explain why it attempted to deceive OTS.  And having the toxic assets serve as security does not address the fact that $3.64 million went out of Gateway's door to Ideal.

---

431 U.S. 63, 74 (1977), and her unequivocal admissions under oath contradict her self-serving argument in the instant motion.  <u>See</u> <u>Chen v. United States</u>, No. 06-cv-7159, No. 02-cr-1039, 2007 WL 4358466 at *3 (S.D.N.Y. Dec. 7, 2007) (dismissing an ineffective assistance of counsel claim when the record clearly established that petitioner entered into the plea agreement knowingly and voluntarily because petitioner's sworn statements at his guilty plea directly contradicted his more recent self-serving allegations).

Defendant also relies on the fact that after the Ashley affiliates' default, Gateway ended up selling the assets for somewhat more than the single offer it had received prior to the round-trip transaction, contending that it shows the lack of potential loss to Gateway. But the final result does not determine the potential for loss. There was no way at the time to know the pricing of a real arms' length sale would yield, nor does it change the fact that defendant made Gateway carry a phony transaction on its books. That put Gateway at financial risk.

Defendant's second, related argument is that she did not intend to cause Gateway any loss, and in fact, she did not. This is a subjective intent argument. She notes that as a major shareholder of Gateway, it would have been self-injurious for her to plan a transaction that would hurt Gateway. She also notes that Judge Bianco found no actual loss at sentencing, albeit for Guidelines and restitution purposes, not on the question of criminal liability (which is different). The round-trip transaction, she contends, had a back-up option in case of failure that would, and did, leave Gateway in no worse a position than it occupied before the transaction.

This argument also reflects an overly broad reading of Rodriguez. Section 1344 covers more than just embezzlement. Rodriguez makes it clear that if a defendant intends to take an action that exposes a federally-insured bank to a risk of loss, and the defendant deceives the institution in taking that action, then the elements of the statute have been met. The intent that is required when dealing with a bank's assets is the intent to take the deceptive action that causes the exposure, not the intent for the bank to actually sustain a loss.

I accept defendant's contention that she did not want to "hurt" Gateway – all she wanted was more time to get the toxic assets off its books, substituting whatever capital Gateway could raise in their place. But many fraudsters have a subjective intent in committing deceptive acts that is equally pristine. They rationalize that if they just had a little more time, then, for example,

11

the market would turn around; or economic conditions would improve and create more sales; or financing would come through to solve the problem created by the misconduct.  I suspect that Charles Ponzi sincerely believed that if people would have just kept buying his coupons, everyone would have kept making money.  But if the scheme created the potential for loss through intentional deceptive acts to a bank's Board of Directors, that's a bank fraud.  As discussed above, defendant put Gateway at risk, both by transferring $3.64 million out that might not have come back, and by creating a phony balance sheet, especially at a time when it was under more than ordinary regulatory scrutiny by an agency with various means of enforcement at its disposal.

There is a related reason why defendant's subjective intent could not give her a complete defense under Rodriguez.  Chemical Bank was such a bit player in Rodriguez that the Second Circuit had no occasion to distinguish between §1344(1) and § 1344(2), treating them *in pari materia*.  Rodriguez, 140 F.3d at 167 n.2.  Chemical Bank was not deceived, and because Rodriguez did not intend to deceive Chemical Bank, neither clause of § 1344 applied.

But seven months prior to defendant's guilty plea in this case, the Supreme Court decided Loughrin v. United States, 573 U.S. 351 (2014).  That case confirmed the prior view of most Circuits that although intent is an element of a violation of § 1344(1), it is not an element of § 1344(2).  The Court reasoned, in part:

> Loughrin's construction of § 1344(2) [to require intent] becomes … untenable in light of the rest of the bank fraud statute. That is because the first clause of § 1344, as all agree, includes the requirement that a defendant intend to "defraud a financial institution"; indeed, that is § 1344(1)'s whole sum and substance.  To read the next clause, following the word "or," as somehow repeating that requirement, even while using different words, is to disregard what "or" customarily means. … Loughrin would have us construe the two entirely distinct statutory phrases that the word "or" joins as containing an identical element. And in doing so, his interpretation would make § 1344's second clause a mere subset

12

of its first: If, that is, § 1344(2) implicitly required intent to defraud a bank, it would apply only to conduct already falling within § 1344(1). Loughrin's construction thus effectively reads "or" to mean "including" – a definition foreign to any dictionary we know of.

573 U.S. at 357 (citations omitted).

The indictment in the instant case charged defendant with a violation of both § 1344(1) and § 1344(2).  Her argument that <u>Rodriguez</u> gave her a complete defense is precluded by <u>Loughrin</u>.  Her allocution confirmed her guilt as to both clauses.  She willfully deceived the Board and OTS, and she sent $3.64 million out of the door without the Board knowing the full reasons why.

Applying <u>Strickland</u> to the state of the law at the time, it is clear that defendant's counsel did nothing objectively unreasonable in advising her to plead guilty.  Indeed, a stronger argument could be made that it would have been objectively unreasonable to give her the contrary advice that going to trial was likely to result in her exoneration.

## III.    Defense counsel's discussions with defendant about the potential defense

Notwithstanding my conclusion that <u>Rodriguez</u> did not provide defendant with a sure-fire defense, I will assume that her counsel had the obligation to at least discuss with her the impact of her expressed subjective intent not to harm Gateway.  The subject of the hearing before me was whether counsel had adequately discharged that obligation.  The testimony from defendant and her former attorney conflicted in answering that question.

Defendant testified that although she repeatedly told her attorneys that she never intended to harm Gateway, they did not discuss with her mounting a defense based on that lack of intent. The only defense her attorneys addressed with defendant, according to her testimony, was to the

perjury charge.  After the motion to dismiss that charge failed, and the case approached trial, the

Cooley attorneys told her the case was "indefensible" and urged her to plead guilty.

I find much more credible the contrary testimony at the hearing of Laura Birger.  At the

outset, I note that although Ms. Birger declined to describe herself as an expert on bank fraud,

she was far from a novice in the area and she knew all about Rodriguez and its progeny.  Prior to

joining Cooley, she had been a federal prosecutor in the Southern District of New York (at the

time of the hearing, she had returned there from Cooley and was Chief of the Criminal Division).

As she testified:

> I had prosecuted it [bank fraud] many times and I had worked on the defense side
> with many cases that raised the specter of that kind of charge.  But I was also
> aware of the *Rodriguez* line of cases and I thought extensively about whether
> there was any avenue to exploit [for defendant] that particular area of bank fraud
> law that existed in the Second Circuit with respect to the facts that were at issue in
> this case. …
>
> I actually had encountered it when I was a fairly young prosecutor in the U.S.
> Attorney's Office in one of my cases, and I thought it was an unusual area of the
> law.  And I encountered it periodically after that, including in cases that I
> supervised where I had to advise AUSAs on whether bank fraud was the right
> charge to bring on particular facts or whether it was, perhaps, safer to go with
> wire fraud or a mail fraud charge.  So I was aware of the area of law and I had a
> little bit of an interest, so I followed the cases that came out that furthered the
> *Rodriguez* line of cases.  You know, one came out every few years.

The Government also introduced into evidence a case note that Ms. Birger had published

in January 2013 on United States v. Nkasah, 699 F.3d 743 (2d Cir. 2012).  Nkasah was in many

ways similar to Rodriguez.  Thieves had opened bank accounts to deposit the proceeds of their

theft; the Second Circuit held that, like Rodriguez, the bank was not an intended victim and

could not have suffered a loss, so the defendant's fraud was not federal bank fraud.  In her case

note, Ms. Birger focused on Judge Lynch's concurrence in Nkasah, in which he expressed the

view that although precedent required dismissal, the precedent was ill-considered.  Ms. Birger

described the concurrence this way:

> []Judge Gerard E. Lynch wrote separately in a vigorous concurrence, conceding
> that reversal by the Second Circuit's prior holdings [was required], but heatedly
> arguing that the court's interpretation was "predicated on an unwarranted and
> unwise judicial injection of an offense element that has no basis in the statute
> enacted by Congress."  The concurrence pointed out that the requirement that the
> defendant specifically intend to harm the bank that he deceived into paying him is
> nowhere to be found in the statutory language itself.  And it also observed that it
> is unsurprising that proof of specific intent to harm the bank was lacking in
> *Nkansah*, because, as with many bank-fraud schemes, Nkansah's intent was to
> profit by obtaining money from the bank rather than to inflict loss on any
> particular victim.
>
> As noted in the concurrence, there has been much litigation about the intent
> requirement of the bank fraud statute, and the federal courts do not agree about its
> interpretation.  Some circuits, like the Second Circuit, hold that an intent to harm
> the bank (or at least expose it to risk) is required.  *See, e.g., United States v.*
> *Odiodio*, 244 F.3d 398, 401 (5th Cir. 2001); *United States v. Davis*, 989 F.2d 244,
> 246-47 (7th Cir. 1993).  One court has held that an intent to defraud (but not to
> harm) is required.  *United States v. Kenrick,* 221 F.3d 19, 26-29 (1st Cir. 2000).
> Another has required intent to victimize (where the bank is the target of
> deception) but not an intent to harm.  *United States v. Leahy*, 445 F.3d 634, 647
> (3d Cir. 2006).  The Sixth Circuit focused more on the fraud element, and held
> that it is sufficient if in the course of committing fraud on someone (not
> necessarily the bank) a bank is caused to transfer funds under its control.  *United*
> *States v. Everett*, 270 F.3d 986, 990 n.3 (6th Cir. 2001).
>
> Obviously, the precise parameters of the intent requirement are in dispute.  In fact,
> the concurrence in *Nkansah* directly invites the U.S. Supreme Court to resolve the
> circuit conflict and reject the Second Circuit's rule.
>
> Until a resolution, the application of the bank-fraud statute in any particular case
> is debatable, even when the conduct is undeniably criminal.  The lack of clarity
> leaves room for defendants to avoid bank-fraud charges even when they utilize
> banks in fraud schemes.

It therefore seems clear that defendant in the instant case had the right lawyer.

Defendant claims, however, that Ms. Birger never discussed this issue with her.  Once

again, I find Ms. Birger's contrary testimony on that issue compelling:

Q.      And do you recall having conversations with Ms. Metaxas where she expressed to you, but I didn't intend to hurt the bank?

A.      Yes, I do.  And we talked about that all the time and we fully believed that.  Any -- any defense at a trial would have involved us saying to a jury that she was devoted to the bank and the bank was facing very difficult times and she wanted to help the bank.  And she had no financial motive, we would have argued, to hurt the bank.  But bank law -- bank fraud law doesn't require that a defendant have as his or her purpose to hurt the bank.  It requires that there be some scheme to defraud the bank, and at that time in the Second Circuit that the bank be exposed to some risk of loss. …

Q.      So was the elements of the crime something that was being woven into the defense you planned to present if the case went to trial?

A.      Yes, of course it was.

Q.      And did you discuss that with Ms. Metaxas?

A.      We did many, many, many times.

Q.      And every time she -- and I assume many times she said, "But I didn't intend to hurt the bank?"

A.      She did say that.  Over and over.  And she would say "how can they say I defrauded a bank?"  You know, "I didn't want to do that.  I didn't want the bank to get hurt."

Q.      And did you in response explain to her what the elements or what the Government needed to show?

A.      We did.  We did.  We talked with her a lot about the different ways in which loss was and wasn't relevant at different stages of the proceeding.

I find Ms. Birger's testimony to be fully credible in light of her demeanor and the details of her recollection.  In addition, I simply cannot conclude that the Chief of the Criminal Division of the U.S. Attorneys' Office for the Southern District of New York was making this up.  In contrast, although I do not find that defendant was dissembling in her testimony, I think she was so focused on her belief that her scheme would ultimately not hurt Gateway that over time, her recollection of the advice she received from her former attorneys has likely been suppressed by

16

her belief in her own lack of intent.  The advice that she has received from her current attorneys – that <u>Rodriguez</u> would have provided a complete defense – has cemented her view.

In sum, my conclusion is that defendant's attorneys at her guilty plea were fully knowledgeable about the requirements to prove bank fraud and accurately advised defendant of those elements.  There was no objective unreasonableness in counsel's recommendation that she plead guilty, and she did so voluntarily and knowingly.

## IV.    The perjury count

Barely mentioned in defendant's opening brief in her § 2255 motion is the fact that under her plea agreement, she did not have to plead guilty to perjury, which, had she gone to trial and been convicted, carried a five-year statutory maximum sentence.  <u>See</u> 18 U.S.C. § 1621(2).  In a footnote, she reprises the argument that her former attorneys made to Judge Bianco, namely, that the question OTS asked her at her deposition was too ambiguous to support a perjury charge.  Judge Bianco rejected that argument and I concur.  At the very least, Count Three of the indictment presented a factual issue for the jury at which defendant would have faced substantial risk.

That is because defendant did not have the better of that factual argument.  She outright denied knowing that the Ashley affiliates were using Gateway's money. "No, sir," was not ambiguous.  It was false.  Her following, unsolicited remark that "one of the things we did not do is verify source of down-payment", would most likely be regarded as an effort at misdirection.  She was not asked if "we verified" the source of the funds; she was asked if "she knew" that the funds had come from the Ashley affiliates.

The perjury charge is important because defendant maintains that she would have chanced it (gone to trial) had she received accurate advice on bank fraud law.  I have already found that defendant was adequately advised about the state of bank fraud law.  If plaintiff was weighing the risk of going to trial despite this advice, the possibility of an additional perjury conviction would have further compelled her towards a guilty plea on one of the bank fraud counts.  I therefore reject her assertion that she would have gone to trial on two highly risky bank fraud counts with the additional high risk of a perjury conviction.

## CONCLUSION

Defendant's motion [87] pursuant to 28 U.S.C. § 2255 is denied.  A certificate of appealability shall not issue as defendant has failed to demonstrate a substantial constitutional question.  See 28 U.S.C. § 2253(c).

**SO ORDERED.**

_____
                                    U.S.D.J.

Dated: Brooklyn, New York
       March 26, 2020